**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| FRIENDS OF ANIMALS | ) | |
| 777 Post Road, Suite 205 | ) | Civ. No. |
| Darien, CT 06820; | ) | |
| | ) | |
|     Plaintiff, | ) | |
| | ) | |
|     v. | ) | |
| | ) | |
| S.M.R. JEWELL, in her official capacity as | ) | |
| United States Secretary of the Interior, | ) | |
| 1849 C Street, N.W. | ) | |
| Washington DC 20240; and | ) | |
| THE UNITED STATES BUREAU | ) | |
| OF LAND MANAGEMENT, an agency | ) | |
| of the United States | ) | |
| 1849 C Street NW, Rm. 5665 | ) | |
| Washington DC 20240 | ) | |
| | ) | |
| | ) | |
|     Defendants. | ) | |

---

**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

---

**INTRODUCTION**

1.      In recent years, the question of providing a place for wild horses on federal public lands has become a controversial issue. Ranchers and others who desire to utilize public lands, mostly in the western United States, for commercial activities desire to have wild horse populations greatly reduced, if not eliminated completely in some areas. Americans, however, who see the wild horse as a symbol of freedom and wildness want to see greater protections for these wild animals.

2.      While Americans may not see eye to eye on whether to leave wild horses on public lands, a vast majority of Americans do believe one thing—that wild horses should not be wantonly killed or injured as a result of human management. Indeed, despite initially authorizing the killing of excess wild horses in the 1971 Wild Free-Roaming Horses and Burro Act (WHBA), since 2009 Congress has expressly denied the use of funds to destroy horses in response to public concern over the practice.

3.      Even so, the Bureau of Land Management's (BLM) continues to undertake management activities that in practice harass, harm, and often kill wild horses. BLM has rounded-up thousands of wild horses by chasing them with helicopters for miles into traps. Captured horses are being held in overcrowded detention facilities, facing a lifetime of stressful captivity. And recently, BLM has authorized the use of contraceptives on wild mares, despite growing evidence that the drug being used can cause significant adverse effects to the horses. Overall, as the National Academy of Sciences recently recognized, the BLM's entire handling of this controversy is a complete mess. *See Using Science to Improve the BLM Wild Horse and Burro Program: A Way Forward* (2013), *available at* http://www.nap.edu/catalog/13511/using-science-to-improve-the-blm-wild-horse-and-burro-program.

4.      And now, despite thousands of comments in opposition, BLM has authorized an experiment to surgically sterilize 225 wild horses. The procedures that will be used in

this "experiment" are appalling, and will undoubtedly result in the injury and death of some wild horse mares and/or their developing fetuses. As one veterinarian commented, "[m]ass experimental surgeries performed under these conditions outlined in the proposal, amounts to negligence and abuse. . . If a veterinarian in private practice performed these procedures in the manner described in this document, they would most certainly be reported to and disciplined by the regulatory board of that state."

5.      Not only does BLM's proposed research experiment raise many ethical concerns, it is also illegal. BLM authorized this research experiment in violation of its duties under the Wild Free-Roaming Horses and Burros Act (WHBA), the National Environmental Policy Act (NEPA), the 2016 Budget Appropriations Act, and the Administrative Procedure Act (APA).  As such, Friends of Animals requests that the Court vacate and remand the June 24, 2016 Mare Sterilization Decision Record, and enjoin the sterilization of these wild mares, until the government fully meets their legal obligations.

## PARTIES

6.      Friends of Animals (FoA) is a non-profit, international animal advocacy organization, incorporated in the state of New York since 1957. FoA works to cultivate a respectful view of nonhuman animals, free-living and domestic. FoA's goal is to free animals from cruelty and institutionalized exploitation around the world. FoA informs its members about animal advocacy issues and its progress in addressing them through its magazine, *ActionLine*, its website, and other public reports. In addition, FoA is a leading organization advocating for the preservation of wild horses on public lands. FoA and its members have significant personal and professional interests in the wild horses held in the Oregon Wild Horse Corral Facility. FoA staff commented on the Environmental Assessment for the Mare Sterilization Research Project, and FoA members have voiced their strong opposition to the three types of mare sterilization proposed here. In addition, an FoA member and staffer who enjoys viewing, photographing, and writing about wild horses has

made reservations to visit the Wild Horse Corral Facility in Hines, Oregon where the sterilization surgeries will take place. She is strongly opposed to the mare sterilization experiment and if BLM is allowed to proceed with sterilization of captive mares, she and other FoA members will suffer harm. In addition, FoA devotes considerable resources to educating its members about BLM's activities regarding wild horse management. FoA has limited staffing and financial resources; the resources dedicated to researching and informing FoA members regarding BLM's inhumane population control activities, which have reached an extreme level with the mare sterilization experiment, has diverted FoA resources from other FoA programs of interest to its members. Therefore, BLM's unlawful conduct directly harms the interests of FoA and its members.

7.     Defendant S.M.R. Jewell, in her official capacity as Secretary of the Interior, has ultimate responsibility for the protection and management of wild horses on public lands administered by her through the BLM under the jurisdiction of the Department of the Interior, and she responsible for complying with all federal laws.

8.     Defendant U.S. Bureau of Land Management is an agency located within the Department of the Interior. BLM authorized the wild horse mare sterilization experiment at BLM's Wild Horse Corral Facility in Hines, Oregon and is responsible for complying with all federal laws.

## JURISDICTION AND VENUE

9.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question).  This action presents a case and controversy arising under 5 U.S.C. § 706 the Administrative Procedure Act (APA). This Court also has jurisdiction pursuant to 28 U.S.C. § 1346, as the United States is a defendant. The relief sought is authorized by 28 U.S.C. § 2201 (declaratory judgment) and 28 U.S.C. § 2202 (injunctive relief).  Venue properly lies in this Court pursuant to 28 U.S.C. § 1391(e), as Defendants maintain offices in this District.

## STATUTORY BACKGROUND

### A.  The Wild Free-Roaming Horses and Burros Act.

10.     In 1971 Congress passed the Wild-Free Roaming Horses and Burros Act (WHBA), 16 U.S.C. §§ 1331 *et seq*., finding that "wild free-roaming horses and burros are living symbols of the historic and pioneer spirit of the West; that they contribute to the diversity of life forms within the Nation and enrich the lives of the American people; and that these horses and burros are fast disappearing from the American scene."

11.     The WHBA requires BLM to "protect and manage wild free-roaming horses and burros as components of the public lands . . . in a manner that is designed to achieve and maintain a thriving, natural ecological balance on the public lands." 16 U.S.C. § 1333(a).

12.     In passing the WHBA, Congress intended the management of wild horses to be kept to a minimal level both to reduce costs and to deter "zoolike" developments.

13.     The WHBA requires the defendants to protect wild horses on public lands.

14.     Defendants are authorized to manage wild horses only "in a manner that is designed to achieve and maintain a thriving natural ecological balance on the public lands." 16 U.S.C. § 1331(a).

15.     Additionally, "[a]ll management activities shall be at the minimal feasible level." 16 U.S.C. § 1331(a).

16.     BLM must manage wild horses as self-sustaining populations of healthy animals in balance with other uses and the productive capacity of their habitat. 43 C.F.R. § 4700.0-6(a).

17.     BLM's management activities affecting wild horses shall be undertaken with the goal of maintaining wild horses and burros on public lands. 43 C.F.R. § 4700.0-6(c).

18.     The WHBA contemplates that when there are excess wild horses on the range, the Secretary could "determine whether appropriate management levels should be

achieved by the removal or destruction of excess animals, or other options (such as sterilization, or natural controls on population levels)." 16 U.S.C. § 1333(b)(1).

19.     The WHBA does **not** authorize BLM to experiment on wild horses that have been removed from the range.

20.     Under the WHBA, after BLM determines it is necessary to remove wild horses from the range to maintain a thriving natural ecological balance it can either (1) destroy horses in the most humane manner possible (which Congress prohibited in the 2016 Appropriations Act); or (2) have the horses "be humanely captured and removed for private maintenance and care for which [the Secretary] determines an adoption demand exists by qualified individuals, and for which [s]he determines [s]he can assure humane treatment and care (including proper transportation, feeding, and handling)." 16 U.S.C. § 1331(b)(2).

21.     Wild horses that have been removed from the range and remain in BLM holding facilities do not lose their status as wild horses under the WHBA, and the protection provided by such status. 16 U.S.C. § 1331(d).

**B. The National Environmental Policy Act.**

22.     NEPA is our nation's basic charter for environmental protection.

23.     Congress enacted NEPA for two central purposes. First, Congress sought to ensure that all federal agencies examine the environmental impacts of their actions before acting. Second, Congress sought to provide the public with a statutory means to be informed about, and to comment on, the environmental impacts of proposed agency action.

24.     Accordingly, before a federal agency can act in a way that significantly affects the quality of the human environment, NEPA requires the acting agency to prepare a detailed Environmental Impact Statement (EIS) that discusses, among other things, "(i)the environmental impact of the proposed action, (ii) any adverse environmental effects which

cannot be avoided should the proposal be implemented, [and](iii) alternatives to the proposed action." 42 U.S.C. § 4332(2)(C).

25.     The EIS is the cornerstone of NEPA. The requirement to prepare an EIS is broad and intended to compel agencies to take seriously the potential environmental consequences of a proposed action.

26.     Whether an agency action is "significant" enough to require preparation of an EIS involves "considerations of both context and intensity." 40 C.F.R. § 1508.27. The context of the action includes factors such as "society as a whole (human, national), the affected region, the affected interests, and the locality." 40 C.F.R. § 1508.27(a). Intensity "refers to the severity of the impact" and requires BLM to consider several factors including: the impacts of the action that may be both beneficial and adverse, the degree to which possible effects are highly uncertain or involve unique or unknown risks, the degree to which environmental effects of the proposed action are highly controversial; and the degree to which the action may have a precedential effect. 40 C.F.R. § 1508.27(b).

27.     Agencies may prepare an Environmental Assessment (EA) to determine whether a proposed action requires preparation of an EIS or warrants a finding of no significant impact (FONSI).

28.     An EA must take a "hard look" at the potential effects of the agency's proposed action and provide enough evidence and analysis for determining whether to prepare an EIS. Agencies must involve the public, to the extent practicable, in preparing this assessment. 40 C.F.R. § 1501.4(b).

29.     Effects include "ecological . . . aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative." 40 C.F.R. § 1508.8.

30.     A significant effect may exist even if the federal agency believes that on balance the effect will be beneficial. 40 C.F.R. § 1508.27(b)(1).

31.     A FONSI is not appropriate where, based on considerations of the context and intensity of the proposed action, a project constitutes a major federal action with significant environmental effects.

32.     Whether in an EA or EIS, an agency must adequately evaluate all potential environmental impacts of the proposed action. *See* 42 U.S.C. § 4332(2)(C). To meet this obligation, the federal agency must (1) analyze all reasonable alternatives to the proposed action, and (2) identify and disclose to the public all foreseeable impacts of the proposed action, including direct, indirect, and cumulative impacts. *See id*. § 4332(2); *see also* 40 C.F.R. §§ 1508.7-1508.8, 1508.9(b).

**C.  Consolidated Appropriations Act, 2016.**

33.     As a bureau of the Department of the Interior (DOI), BLM is subject to Congressional limitations on the use of agency funds.

34.     The 2016 Consolidated Appropriations Act specifies that:  "Appropriations herein made shall not be available for the destruction of healthy, unadopted, wild horses and burros in the care of the Bureau . . . ." 129 Stat. 2242, 2528.

**FACTUAL BACKGROUND**

35.     BLM proposes to conduct an experiment to investigate the complication rates and effectiveness of three separate methods of surgical sterilization of wild horse mares: (1) ovariectomy via colpotomy, (2) tubal ligation, and (3) laser ablation.

36.     To study the effects of various methods of surgical sterilization of wild mares, BLM convened two different panels of experts, the United States Geological Survey (USGS Panel) and the National Research Council Panel (NRC Panel).

37.     There were disagreements between the NRC Panel and the USGS panel regarding the effect of the proposed experiment.

**D.  The 2015 and the 2016 Mare Sterilization Experiment EAs.**

**1.  The 2015 EA.**

38.      BLM published the first of two EAs analyzing the impacts of the mare
sterilization experiment proposals on January 5, 2015 ("2015 EA").

39.      The 2015 EA analyzed only one action alternative, performing three methods
of surgical sterilization on 225 wild mares: (1) ovariectomy via colpotomy, (2) tubal
ligation, and (3) laser ablation.

40.      The 2015 EA did not analyze performing only the least invasive sterilization
techniques.

41.      The 2015 EA referenced the USGS Panel results, including the USGS Panel's
discussion of the impacts of ovariectomies on wild mares. However, the 2015 EA did not
include the USGS Panel's summary table or the notes of the USGS Panel's discussion
regarding the impacts of ovariectomy via colpotomy on mares.

42.      The 2015 EA included an Appendix containing the NRC Panel's analysis of
proposals to conduct ovariectomies, tubal ligation and laser ablation; the NRC Panel stated
that ovariectomies would be less safe for wild mares, would pose greater risk of
hemorrhage and evisceration, and would probably be more painful.

43.      The 2015 EA noted that there was a "marked contrast" between the NRC
Panel and the USGS panel regarding whether ovariectomy via colpotomy posed a threat of
evisceration to wild mares.

**2.  The 2016 EA.**

44.      On May 23, 2016, BLM completed a second EA (the "2016 EA") to analyze the
impacts of the same three methods of mare sterilization surgeries (ovarectomies, tubal
ligation, and laser ablation) analyzed in the 2015 EA.

45.      The 2016 EA, like the 2015 EA, analyzed only a single action alternative:
conducting ovarectomy via colpotomy, tubal ligation, and laser ablation.

46.     The 2016 EA acknowledged that the action would likely cause major complications – defined as death or necessary euthanasia – and the mare sterilization procedures would not stop unless the major complication rate for any gestational stage group exceeded 20%. Thus, this action could destroy, or kill, up to 45 wild horses before Defendants stopped the experiments.

47.     Thousands of people, including veterinarians and equine experts, submitted comments in opposition to the mare sterilization experiment.

**E.   BLM's 2016 Mare Sterilization Research Decision Record.**

48.     On June 24, 2016, BLM published a Finding of No Significant Impact (FONSI) and a Record of Decision (Decision Record) that authorized the only action alternative analyzed in the 2015 and 2016 EAs: performing three types of sterilization on wild mares (ovariectomy via colpotomy, tubal ligation, and laser ablation).

**F.   The Impacts of the Three Mare Sterilization Methods: Ovariectomy via Colpotomy, Tubal Ligation, and Laser Ablation.**

**1.   The impacts of ovariectomies on pregnant mares and their developing foals.**

49.     Ovariectomies via colpotomy involve inserting a veterinarian's gloved arm and a surgical tool into the vaginal vault, making an incision in the vagina, and removing the ovaries of a fully conscious wild mare.

50.     BLM's Decision Record authorizes ovariectomies on 100 mares, including 75 mares that would be pregnant at the time of the surgery.

51.     BLM proposes to perform ovariectomies on wild mares in four stages of gestation: (1) twenty-five mares that are up to four months pregnant, (2) twenty-five mares that are from four to eight months pregnant, (3) twenty-five mares that are over eight months pregnant, and (4) twenty-five mares that are not pregnant.

52.     During ovariectomy surgery, 100 wild mares, including 75 pregnant wild mares, would be injected with sedatives, painkillers, anti-inflammatory drugs, and local anesthesia.

53.     Both the 2015 and 2016 EAs state that performing ovariectomies on mares in various stages of gestation is necessary to "quantify" the impacts of ovariectomy via colpotomy. However, all of the experts cited by BLM indicate that mares subjected to an ovariectomy ia colpotomy in the first months of pregnancy will abort their fetuses.

54.     BLM experts stated that all mares subjected to ovariectomy via colpotomy would abort their fetuses if the surgery was performed in the first 50-90 days of gestation.

55.     BLM experts also stated that half of mares subjected to ovariectomy via colpotomy would abort their fetuses if the surgery was performed between 90 and 120 days of gestation.

56.     In addition, both the 2015 and 2016 EAs stated that there is "marked contrast" between the NRC and the USGS Panels as to whether ovariectomies pose a risk of evisceration to wild mares.

57.     The NRC Panel noted that domestic mares are "typically cross-tied to keep them standing for 48 hours post-surgery to prevent evisceration" but "that protocol would not be possible" for wild mares because "they cannot be held still for so long."

58.     While the USGS Panel notes indicate that none of the USGS panelists considered evisceration to pose a risk for mares, both EAs cite scientific research that the reported complications of ovariectomy include: "evisceration, hemorrhage, removal or penetration of bowel, fatal peritonitis and local infection."

59.     The NRC Panel stated that the two other sterilization techniques proposed (laser ablation and tubal ligation) "would be safer - with less risk of hemorrhage and evisceration - and probably less painful."

60.     The NRC Panel stated that because laser ablation and tubal ligation would be less invasive, other techniques "should replace colpotomy as surgical approaches for permanent sterilization."

**2. The impacts of tubal ligation on pregnant mares.**

61.     The proposed action would authorize tubal ligation surgery on 50 wild mares, 75% of which are pregnant.

62.     Tubal ligation would be performed on: (1) ten to fifteen wild mares in the first four months of pregnancy, (2) ten to fifteen wild mares between four to eight months pregnant, (3) ten to fifteen wild mares that are over eight months pregnant, and (4) ten to fifteen wild mares that are not pregnant.

63.     During tubal ligation, fully conscious wild mares would be restrained, administered sedatives, painkillers, and anti-inflammatory drugs, and the mares' ovaries would be cauterized using a surgical device inserted into the abdomen.

64.     In addition, during tubal ligation each mare's abdominal cavity would be inflated with gas (insufflation). To counter the pain of insufflation, the mare could be treated with an epidural application of morphine or xylazine.

65.     There are no known studies using this technique to permanently sterilize either domestic or wild mares.

**3. The impacts of laser ablation on wild mares.**

66.     BLM proposes to perform laser ablation on up to 50 non-pregnant mares.

67.     During laser ablation surgery, fully conscious wild mares would be restrained, injected with local anesthesia, an endoscope would be "placed in the vaginal wall and advanced through the cervix in an a-traumatic manner," and a laser would be used to scar the mares' ovaries.

68.     There are no known studies regarding the use of this technique to permanently sterilize either wild or domestic mares.

69.     Both EAs stated that laser ablation is applicable only to non-pregnant mares because placement of an endoscope through the cervical opening of a pregnant uterus "would likely result in abortion."

70.     The NRC Panel stated that because wild mares are "extremely sound reproductively," it would be difficult for BLM to obtain 50 non-pregnant wild mares on which to perform this procedure.

71.     The NRC Panel also stated: "Regarding the low number of candidates for this procedure, the [Panel] wonders whether introducing early embroyonic death is acceptable."

**4.     Impacts Common to All Sterilization Procedures.**

72.     Independent veterinarians raised concerns about the dangerous and inhumane conditions under which these surgeries would be performed, and commented that the proposed sterilization techniques as outlined in the EAs amounted to negligence and abuse.

**FIRST CAUSE OF ACTION**

**(VIOLATIONS OF THE WILD FREE-ROAMING HORSES AND BURROS ACT)**

73.     FoA herein incorporates all allegations contained in the preceding paragraphs.

74.     The WHBA does not authorize BLM to conduct the proposed sterilization experiment on horses in BLM's holding facilities.

75.     In issuing the 2016 Mare Sterilization Research Decision Record without complying with the WHBA, Defendants' actions are arbitrary and capricious, an abuse of discretion, and not in accordance with law or required procedure, in violation of the APA, 5 U.S.C. § 706(2).

76.     Absent injunctive and declaratory relief against Defendants, Plaintiff will suffer irreparable harm, and requests the relief set forth below.

## SECOND CAUSE OF ACTION

### (VIOLATIONS OF THE NATIONAL ENVIRONMENTAL POLICY ACT: (1) FAILURE TO PREPARE AN EIS FOR A MAJOR FEDERAL ACTION THAT SIGNIFICANTLY AFFECTS THE HUMAN ENVIRONMENT (2) FAILURE TO CONSIDER A REASONABLE RANGE OF ALTERNATIVES)

77.     FoA herein incorporates all allegations contained in the preceding paragraphs.

78.     The Mare Sterilization Decision subjects 225 wild mares, including over 100 pregnant mares, to inhumane surgery that will likely result in the loss of many healthy wild horses and their developing fetuses, sets dangerous precedent for the future management of wild horses, and involves unique and unknown risks.

79.     To determine whether an EIS is required for a particular action involves consideration of multiple factors (the FONSI factors) including the proposed action's context and intensity.

80.     The FONSI factors do not support Defendants' finding that the proposed action will not have a significant impact on the human environment.

81.     A determination of the intensity of a proposed action requires consideration of various criteria, including: (1) the degree to which effects are highly controversial, (2) the degree to which the possible effects are highly uncertain or involve unique or unknown risks, and (3) the degree to which the action may establish a precedent for future actions with significant impacts.

82.     This decision is controversial; there is substantial dispute about the effects of the proposed action on the quality of the human environment. The proposed sterilization of wild mares is the subject of marked disagreement about the nature of the effects of these procedures even among BLM's own experts.

83.     The proposed experiment involves new methods and surgeries that have not been performed on horses before, and involves highly uncertain, unique, and unknown risks.

84.     This proposed action is intended to guide future BLM policy regarding use of mare sterilization for population control of wild horses in the ten Western states with herd management areas, and is inherently precedential in nature.

85.     The context of this action is also significant. It will directly impact the 225 wild mares that will be subject to sterilization at BLM's Wild Horse Corral Facility, and also impact all Western states with herd management areas.

86.     This proposed action is a major federal action with significant environmental impacts that triggers BLM's duty to prepare an EIS.

87.     Defendants' failure to prepare an EIS for this project violates NEPA.

88.     In addition, Defendants failed to consider reasonable alternatives.

89.     In issuing the 2016 Mare Sterilization Decision Record without complying with NEPA, Defendants' actions are arbitrary and capricious, an abuse of discretion, and not in accordance with law or required procedure, in violation of the APA, 5 U.S.C. § 706(2).

90.     Absent injunctive and declaratory relief against Defendants, Plaintiff will suffer irreparable harm, and requests the relief set forth below.

## THIRD CAUSE OF ACTION
## (VIOLATIONS OF THE 2016 CONSOLIDATED APPROPRIATIONS ACT)

91.     FoA herein incorporates all allegations contained in the preceding paragraphs.

92.     The 2016 Consolidated Appropriations Act prohibits the use funds for a scientific experiment that will result in the destruction of healthy wild horses in BLM's care.

93.     In authorizing the experiment on wild mares in BLM's care that will result in the destruction of healthy wild horses, BLM violates the 2016 Consolidated Appropriations Act.

94.      In authorizing the experiment on wild mares in BLM's care that will result in the destruction of healthy wild horses, BLM's actions are arbitrary and capricious, an abuse of discretion, and not in accordance with law or required procedure, in violation of the APA, 5 U.S.C. § 706(2).

95.      Absent injunctive and declaratory relief against Defendants, Plaintiff will suffer irreparable harm, and requests the relief set forth below.

## PRAYER FOR RELIEF

96.      FoA respectfully requests that this Court enter judgment providing the following relief:

A.      Declare that BLM's 2016 Mare Sterilization Research Decision Record, Finding of No Significant Impact, and 2016 Mare Sterilization Research Environmental Assessment violated the National Environmental Policy Act, its implementing regulations, the Administrative Procedure Act, the Wild Free-Roaming Horses and Burros Act, and the 2016 Consolidated Appropriations Act.

B.      Enjoin any action previously authorized by the 2016 Mare Sterilization Research Decision Record, Finding of No Significant Impact, and 2016 Mare Sterilization Research Environmental Assessment and remand back to BLM the 2016 Mare Sterilization Research Decision Record, Finding of No Significant Impact and 2016 Mare Sterilization Research Environmental Assessment.

C.      Award Plaintiff reasonable costs, litigation expenses, and attorneys' fees associated with this litigation pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412 *et seq*., and/or all other applicable authorities; and/or

D.      Grant such further relief as the Court deems just and equitable.

**CONCLUSION**

97.     For the reasons discussed above, Plaintiff respectfully requests the Court

grant this Request for Declaratory and Injunctive Relief.


Respectfully submitted this 2nd day of August, 2016.

/s/Michael Ray Harris
Michael Ray Harris, (DC Bar # CO0049)
Wildlife Law Director
Friends of Animals
7500 E. Arapahoe Rd., Suite 385
Centennial, CO 80112
Telephone: (720) 949-7791
Michaelharris@friendsofanimals.org


Jennifer Best, (DC Bar # CO0056)
Assistant Director, Wildlife Law Program
Friends of Animals
Western Region Office
7500 E. Arapahoe Road, Suite 385
Centennial, CO 80112
720-949-7791
jennifer@friendsofanimals.org